Good morning, ladies and gentlemen. Our first case for this morning will be Telamon Corporation v. Charter Oak Fire and others. Mr. Plews. May it please the court. I have a hearing loss and so I have a hearing aid and I've got the court system on so if I don't hear any questions you may, if you would please repeat it. We would be glad to help you. It could be that I just need a little more time to answer it. The coverage issue in this appeal turns on the proper application of Indiana's particular rules of insurance policy construction. For a hundred years our state has been developing rules that are really pretty unique to Indiana in some ways. And they revolve around the principle of this, that if it is possible to save the fundamental purpose of insurance, which is to be indemnified against loss, by a reasonable construction, then that's the construction that's adopted. It doesn't have to be the best construction of the term or the only possible construction. It simply has to be a reasonable one because that's why we buy insurance, we buy it to be indemnified. This particular case involves a kind of insurance that is mainstream. Oftentimes I'm arguing about whether a particular loss or incident fits within the general insurance category, say in a pollution exclusion case for example. But here there's theft coverage. And there's no doubt that Tilleman bought two policies actually which covered theft. And the intention was to be covered. And yet somehow, although they suffered a theft loss, this thing has fallen through the cracks in the district court's view. And I think the error was that the court looked for the best construction of certain exclusions and terms rather than to see if any reasonable construction saved coverage. So I would like you to focus, if you could, on the Travelers RAP plus crime policy. And I gather your argument really hinges on whether JSTAR, this company, could be considered a labor leasing firm. Yes, exactly. Certainly that's right. Because if it is, then it fits within the definition of an employee. And not only that, even though in many ways Juanita Berry had characteristics of an independent contractor, and that's what her agreement says she is even, that fits within the definition of an employee under the Travelers policy because there's an exception in Part 5 for anybody that qualifies in subpart 3, which is the part that you just referenced about a labor leasing firm. So the language in Part 5 does seem to indicate that for this policy's purpose, some independent contractors may fall under the word employee. But your opponent has argued that the term labor leasing firm really refers to somebody like a temp agency or someone who is in the business of furnishing employees to other companies. This is where the perspective becomes and the rules of construction become so important because you're supposed to see if there's a reasonable construction of labor leasing firm that saves coverage that is otherwise here. And labor leasing firm is not defined. There are only two cases that parties were able to find. And in both cases, the essentials of the labor leasing firm were the exchange of services from a person who provides services for money. So do you think labor leasing firm is just a synonym for joint employer? No, it's a particular structure where, as with Juanita Berry, a lot of the aspects of employment are taken on by the labor leasing firm, in this case, JSTAR, things like insurance, workers' comp, all those sorts of things. So it is not a joint employment agreement, I don't think. I think this is a labor leasing firm. One of the corollaries of the rules of construction in Indiana is you look at it from the standpoint of a policyholder, ordinary policyholder of average intelligence. And that person would look at this and say, well, if they went to the cases, they'd find the only two cases saying it's where they provide somebody who provides employee services in exchange for a fee. But it really isn't an employee otherwise. They're leased to that company. How many employees did JSTAR have? Just one, just one. Just one. And they're a labor leasing firm. But there's no requirement that they be a particular size. If they wanted to say it applies to temporary health agencies or employee leasing firms of a certain size or they're leased to multiple employers, they could have said that, but they didn't. And we can't read words into what's essentially a limitation on coverage at the point of claim. And so you've got, I think, a leasing. Well, you're reading that as if it says a firm that leases a laborer, whether you lease one of them or whether you lease 25 or whether you do other things. Apparently this firm also, you know, on the upside or the downside of the law, was a firm that also handled equipment. That's correct. That's correct. And it doesn't, again, there's no restriction on it doing other things. That's one of the arguments our opponents have made. But there isn't a restriction there. It's simply, and so you might say, well, maybe a labor leasing firm, the best definition if I was looking for one, might be different, but that's not the standard, see? The standard for an insurance policy is, is it reasonable? Is it a reasonable construction, even if it's not one you'd pick if you were voting 51 to 49 and what it constituted? It's not defined. They could have defined it, and as a result, there should be coverage. And there were limitations on the delegation with respect to Telemann's direction and control. Judge, I'm sorry. I said there were limitations on Barry in terms of what she was authorized to do or not do. Oh, there were. There were indeed, and I'm glad you brought that up because that's the next part of the definition I have to satisfy, which is subject to the direction and control of the employer. That's the end of it. It's an insurance direction and control. And if you look at a consulting agreement, which all the parties agree defines her relationship. Now, I'm not saying she stayed within the confines. Understand, I'm not saying she stayed within the confines of that consulting services agreement, the agreement by which she is leased by JSTAR to the company. She obviously went outside that and stole $5.2 million. But if you look at paragraph 6 and 7 of that agreement, paragraph 6 says, the first professional services shall be performed under the general direction of a designated Telemann contact. Paragraph 7 says, consultant agrees shall now make no commitment on behalf of the company without the specific prior written authorization of the company. The first paragraph says that the consultant shall provide work as an independent contractor and not as an agent of the company. And perhaps most telling of all, there's a description of services that flows from its Exhibit A to that agreement, and it flows from paragraph 1. And it says, the contractor shall perform the following services. It's describing what she's supposed to do. Solicitation of sales projects from Telemann major accounts dictated by the duly designated Telemann contact. That's the section.  All of those provisions give Telemann authority, direction, and control. Now, there's paragraph 9 that says, that they have pointed to, that says that she is an independent contractor and sort of recites almost in a rote fashion the kinds of things that independent contractors usually are. But it doesn't, again, the provision allows for what would otherwise be an independent contractor to be covered under this provision of the policy. It allows for that. And even if the person has this characteristic of an independent contractor. So, and again, it isn't that she, that they exercise the direction and control completely, because if they had, we wouldn't be here. But she's subject to the direction and control. Well, actually, you wouldn't be here if this had been done in a straightforward way. I mean, companies wind up with all of these arrangements, maybe for tax reasons, maybe for other business reasons. But, you know, she's trying to be all things to all people. She's trying to be an independent contractor. They probably were very happy that they didn't have to pay her social security taxes and other sorts of things because this company, which seems to be an alter ego of her, was doing that. But I guess your theory, you really have to use the firm since it's the other contracting party. Correct. And it is a labor leasing firm. And the definitions that we, there are only two cases we mentioned, and it fits within those definitions. And one of those cases, the Torres case, extracts from Black's Law Dictionary, the precise thing that I said, gives a client the right to use the worker's service for a period of time in exchange for a fee. Now, do you have any other examples of these kind of singular acts of leasing out a laborer? Can you think of any situations where that's happened? Any other cases you mean, Your Honor? Cases or, you know, when would somebody do that? When would firm A say, well, we'll let you use employee number one for the next six months or a year, and then employee one will come back? I would think it could be for any of the reasons you were talking about. They may want to have that person be under their direction control and working for them in certain ways but not in others. There could be unique circumstances of all sorts. But the point for coverage purposes is, does it fit reasonably within a labor leasing firm? And there's no reason why it doesn't. And assuming you get over that hurdle, then let's talk about the timeliness of the claim. Since the suit was filed more than two years after learning of the loss. I'm sorry. If you get over that hurdle, and we agree with you, then can you speak about the timing? Oh, the timeliness of the? Yeah, the timeliness, because the suit was filed more than two years after learning of the loss. Yes, no question. The, here, they waive, our position first would be that they waive the timeliness objection under Cuffbee Travelers and similar cases because they let the time, the alleged time pass from discovery while they were still working on even getting back to us with a response in their seemingly never-ending investigation. That investigation doesn't end until December. On their view of things. So in your position, you have to wait until that investigation is over? You had notice. You knew what had happened. We didn't know what their position was going to be. We didn't want to rush into litigation without. But that's not what the statute of limitations is triggered from. When you felt you knew enough, it's triggered from discovery of the loss. It's discovery of the loss. That's right. But Huff has the very same suit limitation. And the court held there that where the insurance company is continuing to evaluate the claim, when that time passes, that's an implied waiver. But the second point about it, the second, I want to get back to the facts on that. You have a better point than that. Yes. Well, facts, that's the law. But that's an Indiana case, I believe. But Teresa Hahn is the person who initially complained about Juanita Berry. Her complaints were in October of 2010. There was then a meeting. There was some preliminary back and forth. Then a meeting in January of 2011. Her testimony, remember, she's the chief accuser. Her testimony was at that meeting. She left that meeting not sure that she had been right, that there was any substance to her complaints. That doesn't mean the company doesn't know, though. It means maybe they're sticking their head in the sand. But she's been trying to tell them with documents. This discovery of a loss, they must know it serves an objective. Most of the cases talk about an objective and a subjective component. But, see, here, I don't see how it could be more direct and specific. November 1, Hahn sends documents to Caleb Holt. Judge, I'm sorry. I'm sorry. I don't see how it could be more clear there was notice and an understanding that there was a real problem because Hahn, it would be one thing if Hahn just sent an e-mail and said, I kind of suspect there's a problem with this billing. But she sends the documents to Caleb Holt detailing the improper charges. That's November 1. Then December 1, Hahn sends e-mails to the HR manager. And then January 1, she e-mails Peter Holt, who is the VP general counsel and senior compliance officer, to report and has the documents. I mean, it's so clear the company had notice. Yeah. There are a couple of responses. In addition to what I told you about Theresa Hahn, there's another. There were other explanations offered at that meeting of what the problem, the discrepancies may have resulted from, including theft by installers and actually just a simple buildup of inventory over time. And what the case law is is you have to have the subjective and objective part is you have to have a subjective belief and also an objective basis for it. It's not mere suspicions. Mere suspicions are inadequate. A California union case is that. Yeah, well, what I'm suggesting is this wasn't just mere suspicions. She had the ammunition right there. She had the ammunition. And then when Barry was brought in before Hahn, Caleb Holt, Peter Holt, and the HR manager, she blamed everybody else for the theft. That's right. That's right. But you had the documents. Until they did an actual, complete, physical inventory, which was what happened in June, they did it in June, they didn't know what it was really lost there. But there's a real problem with that theory because actually, as I remember, from January of 2011 until that time that they finally dig into it, she steals another couple of million dollars' worth of equipment. And under your theory, the insurance company is just stuck covering all of this, even though there was a very, if not 100% certainty, as Judge Williams is saying, a very good reason to adopt additional safeguards, maybe to move her out of that position while they investigate. They just blow it off, and you expect the insurance company to pay. They didn't blow it. They didn't. They did for that six months. There's a million dollars limit on this policy. All right. So a million, but still. And there was money before that, obviously, that had been stolen before the period of time you're talking about. This also is an issue of fact. The judge decided this issue. Actually, he didn't decide this issue. This issue wasn't decided in the court below. It was an issue raised by them but not decided by the judge. But it's been raised as an alternative ground for affirmance. It has. It has. And what I'm saying is that that is typically an issue of fact, and that would allow the full development to see if Theresa Hahn's comment that she was convinced January 11th, that maybe she had been wrong, was credible or not. That's one way of. That's not quite what she said. I think she said something more to the effect of, I've done what I can and nothing else I can do is going to make any difference. I think she just threw her hands up in despair. She said all those. Well, she said what I said, too. She said all those things. And so what are you to do at that point? They continued to look at it, investigate it, and eventually in June they discovered it. But let me make sure I understand the argument in response to my question. You said, well, policy was only a million dollars. You know, she had stolen millions before. You know, she continued to steal millions. But that's not a good basis for us to agree with your position because it would be then the insurance company could really decide in terms of the statute of limitations. They could weigh their losses. They could sort of pick and choose when they were going to do it. And that's not the purpose. I was responding to Judge Wood's point about, you know, they let her stay there and more loss happened. And I'm simply saying that wouldn't be, if you accept the notion that they should have been doing something, which in hindsight is 2020, I think they would all say they should have been doing something, too. It didn't happen. Was that reasonable or not? That's an issue of fact for a jury to decide. Was it reasonable given everything that they knew, everything that was happening, the explanation that was provided? None of this has been explored. It's also a question of what obligations exist under the policy because, you know, the insurance company has a stake in these matters. And it doesn't want to be the last to learn that there's a problem. So there's a duty to notify it that ripens at some point. And I guess the question is whether, at a minimum, by that January date, it was in effect, whether there was a duty to notify then. Well, I think people came away from the January meeting with an answer. And she waits more than two years. I mean, she could have sued, you know, in December of 2012 and still had a lengthy period of time to, or you, I'm sorry, Telemann could have sued sooner. I can't. Could have sued earlier, you mean? Yeah, I mean, it brings this lawsuit, right, February 15, 2013. Right. And if they know in January 2011, and they even actually know in July of 2011 everything they need to know, why wait until February 2013? Because they were trusting their insurance company to process the claim fairly and adequately. You know, you don't file like a protective suit. You can tell the court that, you know, maybe a stay is appropriate. I can't. I wasn't involved in the case at that stage, Your Honor, so I don't know what the thinking was. But I know there are lawyers who are able lawyers. I'm sure they thought of those things, and maybe they thought the better course was to continue to negotiate. And I submit, frankly, that the insurance companies were leading them to believe that was something that they should do. I mean, I think they were in a process of negotiation and exploration. So since you kind of touched on bad faith, has the Indiana Supreme Court clearly foreclosed the possibility that bad faith can extend to claims handling? Yes. Regardless of whether the coverage denial was proper? That would be more than that. The duty of good faith embraces more than a coverage decision. It embraces surely that. You have to act in good faith in reaching a coverage decision. But it's every way how you treat your policyholder. Well, one of the four Hickman factors concerns an unfounded delay in making payment. So are you saying this delay principle should extend to claims handling? Yes. Yes, exactly. And they took the position, and Judge Young unfortunately agreed, that claims handling was not part of a bad faith right in Indiana, a bad faith claim in Indiana. But he was looking at Hickman. It's been over 20 years. The Indiana courts have not gone as far as you are arguing they might go. And it's not up to us to tell them whether they should or shouldn't, but I don't see where they've gone so far as to recognize a freestanding claims handling problem, especially if there's no substantive violation at the end. This would be, if they were not to, if we were to say that Indiana does not recognize a good faith claims handling, Indiana would be virtually unique among American states that have a bad faith in almost every state. But you didn't cite us cases from all the other states. And if Indiana wants to be unique, it can be, by the way. I agree. But we did, actually. We cited a number of cases where good faith claims handling practices were a part of the long footnote. Long footnote on page 43. Yes, thank you. And that's just a sampling. In those cases, good job of describing. And I think you have to go back to Hickman and look what it said. Clearly, Hickman absolutely did not shut the door on a bad faith claims handling cause of action. Right. It has a footnote that says we don't have to go this far. But the thing is they never follow up. They don't do it. I don't think that by that they meant that we, the Supreme Court, will necessarily revisit this before anybody else can do anything further. I think they were instead, by the citations that support that note, there are a couple of notes that they cite to the Indiana bad faith claims statute. They cite to several treatises which list bad faith claims. And they cite cases that recognize bad faith claims handling. They describe a duty that encompasses more than just a coverage decision. Magwerks does the same thing. Even though Magwerks doesn't, in that case, recognize the bad faith claims handling case. No, it doesn't. And you have this somewhat troublesome statement over here on page 43. You say this court should look past the inaccurate recitations of Indiana law found in some decisions of the Indiana Court of Appeals to the fundamental holdings. And that raises a red flag to me. That is directed to the second problem with the bad faith. The ill will part? The ill will, exactly. And that is a, we've cited a number of cases, again, from other jurisdictions that recognize. And I think Hickman, when you look at it, recognizes that that has to do with whether or not you can get punitive damages, not whether there's a cause of action without ill will. In fact, Hickman, at the very end of the section, right before it starts talking about punitive damages, it recognizes that it can have a tort without punitive damages, therefore without the ill will. And that's a sentence that gets overlooked, but it's right there at the end of that section. Well, I realize that this case was removed from the state courts where you would have been in a better position to make these arguments about state law. So it's not your fault that you're in front of a federal court, but you are in front of a federal court. And we only have so much flexibility to tell the state that it's getting its law wrong. And your job, as I understand it, in this area is to predict what the state Supreme Court would do, unless there's a state Supreme Court decision, in which case you follow that, obviously. But here we have only courts of appeals. In fact, returning to the prior point about claims handling, two courts of appeals, so at least five judges of the Indiana Court of Appeals, believe there is a bad faith claims handling tort. And that's a reason for potentially for certification of this issue to the Indiana Supreme Court, because let's ask them rather than guess. Let's find out if they do recognize that a bad faith claims handling tort, as we think they do, or we think Hickman intended, and we think Magwerks doesn't shut the door to that. It actually only needed to, it didn't need to consider that. And that's what it clearly said. It also went on to say that a bad coverage decision is not the only way in which an insurance company can act in bad faith. Obviously, again, suggesting that there may be a bad faith claims handling statute, or a bad faith claims handling right of action there. And the ill will requirement, if we cite a number of cases, 54 to 55 in our opening brief, of cases all over the country, which distinguish between the ill will, just as we're saying, and as I think Hickman did, that that's a matter that applies to seeking a punitive damage award, and not a right of action. You're asking for a very intrusive tort, I'm going to say, where if there is no ill will requirement for your alleged claims handling, you're asking the courts of Indiana, and to the extent they get involved, the federal courts, to micromanage claims handling. If there's an ill will requirement, at least you leave most of it alone, you let it run through the business process, and you have a tort only if there's ill will. But if it's just, we don't think you handled it efficiently. It's clearly more than that. It's not mere mistakes. Well, what is it then? What's your nutshell that it is? Because I'm very concerned about the breadth of the claim you're arguing for. Well, it's set forth in all those cases. Well, tell me. In your own words, tell me what you are arguing for. Things where they do not meet the standard of good faiths. I don't know what that means, though, in practical terms. Does it mean they were negligent? Does it mean they were rude? It means more than negligence. Why doesn't it mean malice or dishonesty or something seriously bad? Well, other things are bad, too, that may not be malice. They may be reckless disregard, gross negligence. They may be things that, well, like this one, for example, not telling the policy or your decision until allegedly two different limitations periods are on. That's the kind of thing. And I was going to comment. So the bottom line is you can't give us a test. The bottom line is you can't give us a test for it. If it's not ill will, what would the test be? Because that's what we're looking for. It's a violation of that duty of honesty and openness. That's the way courts have described it. And I commend the court to the Hatch case, which lists a wide range, 16 different examples, of kinds of acts of bad faith that are in the claims handling area. It can be not timely processing a claim. Here's a good example, Your Honor. It doesn't necessarily involve malice, except it involves putting their financial interest ahead of ours. The whole premise of good faith is that the insurance company is supposed to hold the interest of the policyholder in equal consideration with those of its own and not advantage its own financial interests over the policyholder. And the reason that's so is it's a non-equal relationship. They write the policies. They do this all the time. And we require that. That's the nature of the tort. That's the duty we're asking for. So when they violate that, whether, for example, by not telling an insured that they have decided the claim but continuing to defend or string that claimant along, believing that they still are considering it, in which case conflicts of interest can develop. That's an example, Your Honor, of the kind of bad faith claims handling that's not necessarily malicious in the sense of except to the extent they're favoring their own financial interests over that of the policyholder. If you want to save a bit of rebuttal time, that would be fine. Thank you. Ms. Bird? Good morning, Your Honors. Good morning. Good morning. Your Honors, what we've just heard from Telemach. I'm going to tell you, I know he won't be able to hear you. You're going to have to speak up. What we've just heard from Telemach this morning and in this brief is his attempt to completely turn on its head Indiana's standard for construing insurance contracts. Under Telemach's version, any policy term interpretation it supplies has to be enforced, no matter what the actual language says and no matter the evidence. I don't think that's what he says, actually. I think that's not a fair characterization. I think he's just saying to take this term labor leasing firm, if there are a couple of rational ways it could be interpreted, obviously not some fanciful, crazy way, but a couple of rational ways, you've got to take the one that favors coverage. Now, that's a very common rule, actually. It's not some Indiana-specific rule. Because people pay money for insurance, they're hoping to get, in this instance, insurance against employee theft, which, of course, is normally, we'll talk to your co-counsel, normally excluded from commercial general liability policies. And so he says there's a rational way to read this, and that's how it ought to be understood. Well, first of all, Your Honor, Telemach agrees with travelers about the proper definition for the term labor leasing firm. It wasn't supplied in the policy, but it has been supplied in at least four cases that we've cited in our briefs, Pacific Employers, the Torres case, CARIB asset trading, and J&J Logistics. So Pacific Employers, which is just from the Middle District of Florida, I'm sure it's a fine court, but it's a district court, it's not a binding definition, takes one of the approaches that seems possible to me, takes the approach that you're in the business of placing employees at client companies. So I'm going to call that kind of the employment services model, if you will, temporary or permanent. There is another model out there, and I can think of plenty of commercial examples of it, where for one reason or another, maybe two firms are in a joint venture, and so firm number one loans one of its employees, leases the employee out to work for a year, and firm number two, so that they can accomplish the joint venture's purposes more effectively. So then the first employee comes back. So there are situations where a firm will lease out, so to speak, an employee, without being in the primary business of that. There are other business reasons. And so the question that I have is, given that fact, and that is certainly a commercial fact, is there, does one have to read the term labor leasing firm exclusively, as you think, and from Pacific employers and other places, as being in the business of, or can you also read it as a firm that leases out labor, sometimes, all the time, occasionally? I do think labor leasing firm has to be a firm in the business of because you accept. Why does it say that then? Well, it says labor leasing firm. I understand, and I'm telling you it can mean two things. It can mean sometimes or all the time. Well, if you interpret it the way Talamont has asked the court to interpret it, it would mean any company. It would mean any company that enters into a written contract for services that is provided by a human being. It would have to be a labor leasing firm under that interpretation. So with respect to that one employee, so, you know, JSTAR leases out the labor services of Juanita Berry, and so Berry is somebody who is a leased employee, not a directly hired employee, and would be covered. If JSTAR leases, you know, winds up with two or three people, unlike its present situation, and it leases somebody else out to another firm, then that's not somebody under your policy. But the point is to bring in all people who are performing the function of an employee, and you look at the breadth of this paragraph 3, is any natural person who is leased under a written agreement subject, of course we have the other things, Judge Williams is exploring direction and control, performing services for the insured. So I just don't know that that's your best argument. Well, that's just it, Your Honor, is the definition of the crime policy provides for any natural person who is leased to the insured under a written agreement between the insured and a labor leasing firm. It doesn't say between the insured and a company or any company, and what you would have is a situation where, under Telemann's interpretation, take the consulting firm Ernst & Young, for example, that by virtue of the fact that Ernst & Young enters into contracts with clients to provide consulting services to those clients and then deploys one or three or five consultants to the client site to do work for any length of time, Telemann is asking this court to believe that an ordinary policyholder of average intelligence would consider Ernst & Young a labor leasing firm. Why not? I mean, sometimes they last for a year. I'm not sure that example helps you. They are a firm who are in the business of leasing out particular expertise that maybe the client firm doesn't have for a period of time, for as long as is necessary. Sometimes it's IT services. Sometimes it's management organization services. But if they are subject to the insured's direction and control, not to Ernst & Young's direction and control, which might distinguish some of that, and they're performing services for the insured, they're rewriting their code or something, what if they turn out to be a thief? You could have a consultant that's a thief or you could have an employee that's a thief. This covers a certain class. The crime policy covers a certain class of insiders defined as leased employees. It doesn't cover independent contractors. And it also includes independent contractors if they are captured in paragraphs 1 through 5. Right. Here they're not. Well, you say. That's our question. They're not. And it's precisely because JSTAR and Berry together were an independent contractor. Which is such baloney. Really? I mean, if this were a labor case, she is about as independent as the staff help that you have in your law firm. And that would have been information if they changed her actual relationship with Juanita Berry. That was information that Telamon had. That wasn't information that the insurers had. No, they didn't need to change anything. They were playing games with, you know, legitimately, let's assume, with tax obligations and the like. But the insurance policy clearly takes a functional approach. And that last paragraph is what nails that down. Well, right. Independent contractors are excluded from being employees within the definition of the crime policy unless they fit within one of those specific definitions. Exactly. That's why I say it's a functional approach. An agent, a broker, a factor, a consignee, an independent contractor, etc., etc. need to be assessed under paragraphs 1 through 5. And if they match any of those, then they're covered. And if they don't, they're not covered. And Juanita Berry didn't for a couple of reasons. The second independent reason is because the conclusive evidence, as well as the 30B6 testimony of Telamon's own officers, was that Telamon did control Juanita Berry's day-to-day details of how she went about her sales role or her operational role. That's because she was a very highly placed employee. And so I'm going to tell you that, for example, the chief operating officer of Apple Computers probably doesn't have his day-to-day activities controlled very much either because he's in a very responsible position. But it doesn't mean he's not an employee of Apple. He is an employee of Apple. The further down the totem pole you go, the more micromanaging of work you would expect. But Berry winds up as the vice president of major accounts in charge of the entire New York, New Jersey area. That's a very high-level spot, I would think. She assumed that role herself according to the testimony of Stanley Chen. Well, we have to assume that that's correct. But even with that in mind, Your Honor, Berry was hired and JSTAR entered into the contract with Telamon, not because JSTAR was going to be the company that started supplying Telamon with labor. It wasn't supplying Telamon with a labor force. It was specifically contracting for the idiosyncratic knowledge and experience Berry brought to Telamon because of the fact that JSTAR was in the business of telecommunications sales, and she had relationships with Telamon's biggest client, AT&T. That's why they brought her on. JSTAR and Berry are one. Yeah, but when you look at the consulting contract, it seems to really suggest that both JSTAR and Telamon were empowered to direct and control Berry's work, right? No. Because, you know, if you read it that way, the contract is somewhat ambiguous. Actually, paragraph 9 of the consulting contract say that the consultant, which is Berry and JSTAR, it's a one-person consulting company owned, operated by the same person, Berry. It says that under this agreement, the consultant shall at all times, that the person performing under the agreement, quote, shall at all times be under consultant's exclusive direction and control. Those are the words in the paper, but the reality is that she operates under the supervision of one of the Mr. Ho's, I forget which one, and she is doing the business of the company just as any highly placed executive would. The relationship evolves over the years, and you're basically saying that an Indiana court would give precedence to labels over substance, and I'm not sure that's an accurate statement of Indiana law. It's not just labels, Your Honor. It is labels. But if you look even beyond just the consulting contracts, which Travelers Always is conclusive, if you look at the testimony of Stanley Chen, the chief operating officer, if you look at the testimony of Caleb Ho, the head of her division, she was only answerable to management for her financial results. She wasn't answerable to them for how she dealt with the clients. Do you think that's any different from the head of Buick for General Motors? Do you think they care about anything else that person does other than the financial results for Buicks? Well, Telamon's own director of risk management said it did make a difference what she was. He gave testimony under an examination under oath during the claim investigation. This is from Jeff Reinking, that Telamon had asked Berry to convert from a consultant to an employee, but she declined. And Mr. Reinking testified that if she had been Telamon's employee, they could have run a background check. They could have forbid her from doing other work. Are you telling me that companies can't run a background check on the independent contractors? This is Mr. Reinking's testimony. Oh, please. And he also said that if she had accepted the offer to become an employee, they would have expected more loyalty from her. That's from his EEO deposition, which is Telamon 1, docket number 232-4. It is ridiculous. Pages 82 through 83. That's Telamon's own director of risk management saying that it did make a difference. Well, of course, they had an egg in their face by that time, so I guess it's not that surprising. But the functional question is, what work was she doing day to day? Who was controlling it? Who was the work for? And the kinds of things she was doing were employee kinds of things. She's controlled by Caleb Ho in the way that a high-level executive would be. Well, the chief, Stanley Chen, CEO of Telamon, testified that, yes, she started out in a sales role, and that's reflected in the consulting agreements, paragraph 3, that her responsibilities were sales. And then if you go to Exhibit A attached to the consulting agreements, they state that her duties, her work may change over time just due to the nature of this industry. That's in the description of her services. Just because she may have expanded her role at Telamon does not mean the nature of her relationship as set forth by the consulting agreements. Except the expansion of her role, that was something Telamon knew. Well, Mr. Chen testified that this was because she was the one who was supposed to bring in and grow sales, especially with AT&T. So putting her in a supervisory role over AT&T projects, that helped Telamon's end-to-end customer service. So in other words, you're not disagreeing with Judge Wood. Exactly. So they knew her role had expanded. They were aware of what she was doing. They were not micromanaging her, as Judge Wood said, but they knew the scope of her responsibilities, and they were fine with that because they wanted to keep AT&T. Exactly. But as Mr. Ryan King testified, there was a difference between the fact that she wasn't an employee and was an independent contractor. It made a difference to Telamon. Your Honors, turning just briefly to Traveler's suit limitation defense, I just want to note that Telamon's counsel raised implied waiver of this defense, and this argument was never raised in the appellate briefs. Second, with respect to him stating that they couldn't file suit because we were conducting our investigation and somehow their filing of suit was reliant on our investigation, suit limitation defense in the crime policy turns on when discovery occurred, and discovery was actually one of the issues under investigation. So to say that he couldn't file suit because we needed to investigate, that was the issue we were investigating, discovery. And going to the appeal on bad faith. I think you're eating into your co-counsel's time, but if that's all right with you. I'm going to be addressing bad faith, Your Honor. It's a joint. I'm just noticing that the red light is on. Excuse me. Thank you. Okay. She's yielding you five minutes. Okay. So, Your Honor, this was a Rule 12c motion that was decided by the district court. So the district court was constrained to look only at the claims as pled in the complaint with the crime policy. All of the pleadings, right, with the attachments. It couldn't look beyond that. Now, Tauliman didn't argue or didn't claim ill will in his pleading, and that element is a necessary element for a bad faith claim. The Indiana Supreme Court has held that, in MagWorks, that a finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will. When it held that, it didn't say anything about this element is only required for claims involving punitive damages. And a long line of Court of Appeals of Indiana cases have come actually before and after MagWorks holding that bad faith requires a culpable state of mind such as ill will, even in cases where there was no punitive damages at stake, including auto owners versus C&J Real Estate, Oxendine versus Public Service Co. Tauliman failed to plead ill will. They only pled unfounded denial of coverage, which you don't have here, and unfounded delay in exhaustive and expensive claims investigations. So when you read Hickman, obviously your position is that the delay principle doesn't extend to claims handling, right? It doesn't, and embedded in that ground is that if you delay making payment, it's an unfounded refusal to pay policies. So what if an insurer took 10 years to do an investigation and then give notification about the coverage denial? Well, I would want to know what was going on in that investigation. Is there any Indiana case that explicitly says that bad faith does not extend to claims handling? Yes, that's MagWorks, Your Honor. That's the Indiana Supreme Court case MagWorks. That's a claim where the insured had claimed bad faith manner of claims handling for the insurer's conduct leading up to and including the claim denial. They basically acknowledged a covered claim and then went ahead and denied it. Now, if that statement in that case is indeed a statement of Indiana law, is Indiana law in the heartland of insurance law in the United States? I think it is in the heartland in the sense that you don't see cases where an insurer, when a first-party insurer is right on coverage and then it's held to be in bad faith for the way it handled its claim, and it certainly has been rejected by the Indiana Supreme Court. Indiana does not stand for the proposition that you could be right on coverage and still be subject to bad faith. It also clearly shut the door on claims for bad faith claims handling, and that makes complete sense for first-party insurance policies. What about the conflict of interest situation your opponent raised, that the way the claim is being handled, regardless of what the ultimate decision is on coverage, might be done in bad faith because there's a conflict of interest between the insurance company's financial stake and the client? Your Honor, I don't believe that was an argument they made in their briefs. But still, it's a persuasive example of someplace where you might have bad faith in a way that we would be very concerned about in the insurance context. Well, all they've pled here is that we did too much investigation. As a matter of theory, forget about this case. Hypothetically. You know, why wouldn't that be an example, that the bad faith claims handling theory is one that should and would be applied in Indiana in some circumstances? Perhaps under a liability policy where there is concerns about a different set of concerns about how an insurer reaches a coverage determination. It has a whole different set of duties for coverage and defense obligations and their corresponding good faith duties than a first-party insurer has, which is paying a claim directly to my time is up, Your Honor. You can finish your sentence. A first-party insurer is just looking at whether or not their claim is rightly payable or not. Liability insurer has a completely different set of concerns that aren't at issue here. So while your hypothetical may raise a good point in a liability context, it doesn't play out for the insured on a first-party policy context. Okay. All right. Well, thank you very much. Thank you. Ms. Chapnick. Please, the Court. I want to go back for a moment to the rules of policy construction because they're obviously very important to the issues involving my client. Right, so because you're in the awkward position now that Ms. Bird has told us for 20 minutes that under no circumstances can Ms. Berry be considered an employee, you're here to tell us that she is an employee. No, I'm here to tell you that she's an authorized representative or anyone to whom they entrust the property for any purpose. Much broader, it doesn't necessarily turn on her specific employment relationship, but all the facts you've been talking about this morning and the questions that you've asked counsel simply underscore the fact that they put this woman in the position. They gave her the keys to the castle. They put her in a senior leadership and trust position, and that's actually the language out of that narrative that was attached to the sworn statement and proof of loss that they submitted to the crime insurer. And then it went from there. You know, they put her in charge of the whole Dayton facility and all the personnel and hiring and firing and the removal program. I mean, they put her in charge of the property that she ultimately stole. All of that feeds into the dishonest acts exclusion. And just I know you know this, but we issued a property policy, not a crime policy. Property policy is very different than a crime policy. Now, interestingly, our property policy has a crime additional coverage endorsement, which is docket 204-1 at page 57. And the reason I raise that, not because they're making a claim under that, because they're not, and not that she fits in with the class of persons that are specifically defined in that crime additional endorsement. But what's so important about that endorsement is if the dishonest acts exclusion was not as broad in the class of people that it doesn't insure, there would be no reason for that crime additional coverage endorsement. Because why do you need to give back, in this case, $10,000 of coverage? Yeah, you've taken out a lot. You have this little bitty $10,000. I think that's why they didn't bother, actually. Correct. It's hardly there. Absolutely. But I understand. But you see the frustration. Here they thought they did the right thing. They've got a general policy, yours. They've got a crime policy, travelers. And somehow they're told by everybody, well, she is an authorized representative or somebody entrusted. She's doing all of these employment things that you just ticked off, so we don't have to pay. And they're saying, oh, but she's just this complete stranger, leased employee. They barely knew her, so we don't have to pay. Well, I think, actually, Telemon finds itself in the position that it is in because of Telemon's own actions. Because the fact that they took this woman who was an independent contractor, and I'm not going to articulate travelers' arguments. They're doing fine by themselves. Right, exactly. It falls outside their policy. But she's within this class of people that are not covered by our policy. It's the way that they handled their relationship with Ms. Berry that they find themselves in the position that they're in. And so going back to their premise in analyzing this policy is that we've got to start off with construing the policy against the insurers and look at Telemon's reasonable interpretation. All of the cases that they cite to support their construction are all cases where courts first found a provision to be ambiguous. Every single one of those cases, the Kiger case and so forth. I think we're on common ground there. I mean, the question is, is there an ambiguity that we should recognize, not whether that's an important step. Right, well, with regard to the dishonest acts exclusion, the language itself, I mean, the Indiana courts uphold their contracts. They uphold insurance contracts under the same rules of construction of any other contract. There's no special rules of construction for an insurance policy. And they will enforce the contracts based upon the written contract and give undefined terms, which are not automatically ambiguous. They're plain and ordinary meaning. So we look at the dishonest acts exclusion. It uses these very broad classes of persons, authorized representative or anyone to whom you've entrusted the property. The case law, they have not cited one case that holds or stands for the proposition that the term authorized representative is ambiguous. Not one. Every single case that we've cited, and there are many in our brief, have upheld that undefined term as unambiguous. And same thing with regard to the entrustment part of it. Upheld it as unambiguous. And every court has gone to the dictionary and come up with dictionary definitions. In the case of authorized representative, the dictionary definition that they have applied is that the person has been empowered or permitted to represent another or act on its behalf. That's Ms. Berry in spades. I mean, we don't have to recount all the evidence again, which they've never disputed below. And they're not disputing in this court either. And same thing with regard to entrustment. And your argument has to be that the scope of her responsibility, we have a granularity level issue here, right? You know, she's generally authorized to dispose of the property. Obviously, nobody ever authorizes somebody to steal, so you don't need to be that specific. Correct. But your position has to be that the breadth of authority she was given is enough to encompass her abuse of that authority in the way that she did abuse it. And that's what all the cases, both under authorized representative and entrustment, say. And to your point that she doesn't have to be authorized to steal, and their argument is sort of a shade of that. They don't say that, but it's a sheep in another clothing. But the Milwaukee v. Frontier case says no one's ever authorized to do the dishonest acts that someone's engaged in. I mean, if that were true, that would abrogate the exclusion altogether. But you would agree, you know, if she was responsible for, you know, advertising or something, and she then somehow diverted property to her Florida people, that would be outside the scope of her business for the company. It would be factually specific, but what I'd say is the term authorized representative doesn't have limitations or restrictions on it. It just says authorized representative. So if Telamon, or the person that you're using in your hypothetical, has been empowered in some way or permitted to represent a party in the advertising sense, and that gives her access to take whatever it is that she's, that person has taken, she's an authorized representative. I mean, that's the situation, or someone to whom they've entrusted the property, that's the situation in the Wagner v. Indemnity case, where an independent contractor who's given the keys to someone's warehouse to clean it out, and he goes ahead and steals everything. He wasn't authorized to do anything other than to, you know, that particular job, so that's beyond that. I mean, and none of the cases have said that someone's scope of authority has to be only the job or activity for which that person is hired or retained, and that's the breadth of this exclusion, again, because it's a property policy. It's not a, it's not a crime policy, and the intent of the policy is not to cover stuff that a crime policy, if someone falls within the terms of that policy, is covered. With regard to, I want to just briefly touch on the consolidated appeal on Telemon II. The, and just to put it in procedural perspective, Telemon in Telemon I, about a year after the deadline for filing a motion. No, no, we know this, and the question in Telemon II is really, this is a situation, I think, within the rule of the Semtec decision, the Supreme Court, you know, in which Court Number 2 needs to give a diversity judgment, the same effect that the state would via borrowing. It's a federal rule, but it's a borrowed federal rule. So the question is really whether Indiana would apply this claim-splitting rule when you have a different party and different policies and some differences, although fundamentally the underlying theft. Well, and in this case, yes, there's a different insurer that they added. Yes, there are different policies that they've added, but everything else is the same. And what the district court looked at, which is the privity rule and the fact that Charter Oak and St. Paul are affiliated companies, all part of, you know, the same parent company of travelers. And in that situation with that privity, they're viewed essentially the same. They're being represented by the same parties. And what they're really doing is they're unhappy with the fact that they had their motion for leave to amend denied. They're end-running it. They didn't appeal that, interestingly, which I think is very significant in this case. And now they've come back with this second suit to try to get a second bite at the apple. And the law does not allow that. I see my time's up. Thank you. All right. Thank you very much. Anything further, Mr. Plews? Thank you. First, in answer to your questions, Judge Ripple, of Ms. Bird, actually Magwerks says flat out – the court sustained a jury verdict on bad faith punitive damages. At the same time, it reversed the summary judgment on coverage and sent it back to the trial court. So, yes, you can have bad faith without necessarily showing you're entitled to coverage. That's exactly what happened in Magwerks. That's the end result of that case. The second thing I want to say about Magwerks is that it does not say that bad faith requires ill will and so forth. It has a sentence that says, as a general proposition, bad faith requires some kind of furtive intent, and all those kinds of things. And interestingly, both the district court and CNS travelers in their brief omit that section, which obviously says if it says as a general proposition, then there are times when it's not the general proposition, and therefore there can be bad faith without those kinds of ill will and furtiveness that we're talking about. I did want to touch briefly on some of the arguments about authorized representative and so forth. And I need to correct something. The trial cases are not cases where they apply the ambiguity rule. That's not where they say the thing's already ambiguous and then apply the rule. There's an end result rule that is construed in favor of coverage. But the rules of the cases also say how you decide if something's ambiguous. And that's Lilly and Kiger and other cases. And they say you look at it and say if there's more than one reasonable construction of the term, exactly what I've been saying, then it's ambiguous and you construe that in favor of coverage. And that's not just Lilly and Kiger. It's also Liggett. There's a quotation in Liggett from Appelman and a quotation from Professor Keaton to the same effect that oftentimes the law takes positions on meanings of particular coverage terms, which wouldn't be those which we'd select if we were trying to identify them. Right, but you agree. Until you find ambiguity, you don't get into the contraproferentum. No. You have to find that ambiguity first. Yes, and to do that. But how you do it is also set forth in the cases. And that is if it's more than one reasonable construction, which brings me to the phrases authorized representative and entrusted. Authorized representative can mean, if you just look at it, it can be specific, that it's authorized representative with respect to the specific property that's at issue in the claim, or it can be an authorized representative generally. Doesn't it say for any purpose? No, it's entrusted for any purpose. Entrusted for any purpose, yeah. And entrusted in all those cases that she was talking about, there is an entrustment of the property to possess that particular property for the task that was being performed. Juanita Berry did not have that possessory. She was not given that authority. She wasn't authorized to sell those returned materials. There's not a record of her selling any, except, of course, on her own account, I mean, selling and taking the money herself. But that wasn't what she was supposed to do. And that wasn't what she was authorized to do. And as a result, I see my time's up. Thank you. All right. Thank you very much. Thanks to all counsel. We will take this case under advisement.